Good morning. My name is Vince Franco, Federal Defenders of San Diego. I represent Mr. Bello. Agent Rodriguez, the arresting agent in this case, testified that a night scope operator was the first to see Mr. Bello. He testified that the night scope operator had Mr. Bello under constant surveillance. Finally, he testified that he had no idea when this constant surveillance began. Can you infer from that that it was from the time he had crossed the border? Yes, you can infer. Why? Well, first of all, the area that they're in and the duties that they were performing, there's direct testimony that they're performing line watch duties, which the agent described as we're actually driving back and forth looking for foot traffic that comes from the south side of Mexico into the United States. That's at Exit of Record 84. Also, just the purpose of a night scope operator in that area is obviously to detect illegal aliens coming from Mexico to the United States. It wouldn't make sense to position this night scope operator in a position where he can't monitor people coming into the United States and can only monitor areas a mile north or further from the border. Well, what doesn't make sense, what doesn't make sense is to monitor somebody for a mile. Does it? Well, that's a long time to monitor somebody. What is that? What would that be, 15 minutes of walking? We don't know exactly what time he started monitoring him or exactly what time. That's exactly right. We don't know when he started monitoring him. Correct. And the burden, of course, is on the government to prove the lack of official restraint. The law in this circuit is clear. First, that in a found in offense that the government must prove lack of official restraint. I think our case also says that the defendant needs to point to something that suggests that he was under official restraint. The things I point to is that there's constant surveillance by a scope operator. And from that, we have to infer from the facts that it was from the moment he crossed the border. Correct. But I think you have nothing direct that says that they saw him when he crossed the border. There's nothing direct that they saw him on the Mexico side. There's nothing direct on the U.S. side. And I think what's important to remember is that there was an exhibit submitted at trial that sort of described the area. It was a map of the area. Correct. And that wasn't in any of the excerpts of record. From that, can you tell where all this is taking place? Actually, counsel and I looked at it last Friday. I can't tell. You have a map and it basically shows the position of this ponds area and then a blowup photograph of the actual area where the alleged apprehension took place. But it doesn't show where the scope operator was. Correct. We don't know exactly where the scope operator was. We don't know what he was monitoring. And I think if you look at the Ruiz Lopez case from the circuit, in that case you had a situation where the arresting officer couldn't remember arresting the person in that case. And what he testified to is, well, you know, I don't remember arresting this person. But my usual practice is that I watch people coming from the south, from the southern, basically in through the outdoor of the port of entry at Calexico. And if I see someone, I'll follow him into the shopping center and ask him about immigration status. But he had no idea when he arrested Mr. Ruiz Lopez if he had followed that procedure or not. No.   There was one more thing that I want to point out. This court held that he was entitled to a judgment of acquittal on a Rule 29, you know, because the government had to speculate regarding the official restraint. Were you the trial? No, I was not. Well, can you tell from the record? Was any argument made at the trial about, you know, official restraint? There is a lot of argument on official restraint regarding a jury instruction on it. Well, I mean, to the jury. No, because we weren't. We were precluded. Instruction wasn't given. Correct. So I guess that was taken as meaning couldn't be argued or it would be useless because there was no instruction. Correct. I mean, I don't think a jury would understand that you can be physically present in the United States, but not have entered the United States without an instruction on official restraint. As far as, you know, are there situations where a night scope operator would view an individual but not report it to someone else? Well, that has occurred in one of the prior cases of this court. If you look at Ramos Godinez, the scope operator in that case watched a group of individuals cross over what they call a berm. And the berm is what separates Mexico from the United States. Went across a narrow strip of land into what is, I think, a 360-feet canal, all-American canal. But he didn't even notify his partner of what he was seeing on the scope until after the individuals had reached the other side of the canal. So there are circumstances that this court knows about where night scope operators don't reveal the presence of someone until sometime later. And that's exactly what could have occurred here. We don't know because the government didn't prove it. But I think if you read these cases together, you know, Ruiz, Lopez, and you contrast that with Castellanos, that this court has pretty much held. You need to call the person who first sees the individual come into the United States. And you need that individual to testify and affirmatively show that they were first seen in the United States. I think we have some cases that say if they find somebody in the United States, you know, it's presumed that they're here voluntarily. Well, voluntarily. Not under restraint. Yeah, but they don't presume. Until a defendant points to something that suggests that they were under official restraint from the beginning. And so what you point to is the scope operator had him under constant surveillance. And the question is, would it be reasonable for the jury to infer that it was from constant surveillance from the time he entered the country? Well, I think there's another key piece of evidence here. And that's that the person, the arresting agent, had no idea when that surveillance began. And that's key because this is a border patrol agent with two years of experience, experienced in this area. And for him not to have at least some idea of where this surveillance began, I think is telling. Because now what you're asking the jury to say is, well, even though the arresting agent had no idea, well, looking at the light most favorable, the evidence, a reasonable juror could somehow conclude that on these same facts that he was first seen in the United States and not Mexico. And if the arresting agent had no idea, I don't see how a reasonable juror could have some idea of where this surveillance began. I mean, if the arresting agent or case is talking about constant surveillance from the time that the moment they entered the United States. So the question is, under all these circumstances, would it be reasonable for the jury to infer that he was under constant surveillance from the time he entered the United States? Well, I think it is from the fact that they're performing. Is that enough? Is that enough to justify, to require the court to give an instruction on your theory of defense? Well, I think it's enough to give a rule 29 and it's obviously at least some evidence to argue. And that's all you need for a jury instruction. What's our standard of review in assessing whether or not the district court was correct in not giving a. It's de novo review. And I believe even the government concedes that it's de novo review on this. Looking at all the evidence, it's de novo? Well, if you're looking at the rule 29, you're looking at the evidence most favorable de novo, but looking at the like the evidence most favorable to the jury or to the government. The jury instruction went when when the district court was looking at all the evidence to determine whether or not a. The instruction you wanted was necessary. Well, that's our standard to review and determine whether or not his determination that you weren't going to get it was. The problem with that is the actual ruling the district court held wasn't that there was insufficient evidence. The district court made a ruling of law that constant surveillance could not constitute official restraint. Well, but in that circumstance, isn't the answer to Judge Biles question then the review is de novo? Correct, because the district court didn't make a finding. Whether or not there's sufficient evidence upon which a jury could return a verdict in your favor on that issue. Correct, because the district court did not make a finding. I'd like to reserve the rest of my time for rebuttal. Good morning. May it please the Court. Mark Rahe for the United States. Your Honor, in this case. Did you try that case? No, I didn't, Your Honor. So unfortunately, I believe my opponent and I are both in the position of trying to infer what we can from the record. But that is exactly what this Court is asked to do time and time again on a sufficiency challenge. And as this Court knows, the standard, even if it is de novo, we still must look at the evidence in the light most favorable to the government. Well, not on the jury instruction issue. Well, I believe it's there. You look at it in the light most favorable to the defendant. In other words, you know, would the evidence support that theory viewed in the light most favorable to the defendant? You don't need too much evidence to support to give them an instruction, do you? Perhaps not. But on that issue, and I wanted to address the judgment of the quill before I reach the jury instructions. I mean, the jury instructions, you still have to have evidence to support an instruction under the law and based on reasonable inferences. But our entire theory of this case, as we set forth in our briefs and as I'm going to try to explain now, is that any inferences that you try to draw on behalf of the defense are unreasonable. In this case, could there have been a better record? I don't think they're any more unreasonable than the inferences to be drawn in favor of the government on that issue. Well, I respectfully disagree, Your Honor. I mean, in this case we have what the facts show is that this defendant was found a full mile north of the border by the arresting agent, Agent Rodriguez. He testified that no other agent had contact, and by that I assume he meant physical contact, with that defendant before he did. And the only question, then, is what role does Agent Drake's surveillance have on this issue? But the evidence also. Agent Drake was the scope operator? Scope operator, exactly. And the evidence shows that Agent Drake first made a radio call to Agent Hernandez at 3 in the morning. And the record shows that at that point the aliens were already at the Higgins Pond point. I thought he'd been tracking them. There's no evidence of that. Before they got it. Well, that's sort of the question, but I think that would be an unreasonable inference, because as Judge Shishima pointed out, this was 3 in the morning. Because it was a mile away from the border? A mile away from the border. And it's not just a mile away from the border. You never know. But a mile away from the border, it's not like the evidence was that this was just a flat plain. It's not like this was Kansas. There was specifically. What was the condition of the terrain? The condition of the terrain, there was testimony to that, and it's found in Excerpt Record 85. Agent Rodriguez testified that this area, and I quote, was very desolate, rocky, mountainy, a lot of brush, a lot of weeds, branches, and cactus. So there are a lot of obstacles that people can hide behind. We also have in the record that at the point of arrest, this defendant was found hiding face down in the dirt underneath bushes. So it's not as if this was just some open area, and I believe counsel referred to the Ruiz-Lopez case earlier, if my recollection serves me. That case was a defendant who was found at a port of entry. The evidence in this case was that this Higgins Pond area, it's not only one mile north of the border, it's 18 miles away from the nearest point of entry, and that would be the Tecate Port of Entry. So we have testimony. It's 3 a.m. It's pitch dark. It's desolate terrain. It's rocky. It's mountainy. And these are three individuals, not just one, but three aliens. And how could it be reasonable to infer that a Border Patrol agent would wait the amount of time it takes, not just one, but three aliens, to traverse ground, rough ground, for a full mile before notifying an agent? And it doesn't just end at that, Your Honor. I mean, there are other evidence. There's other evidence from which we can draw inferences here. Another one is you might say, well, maybe these aliens were headed in a position where they were going to inevitably bump into Agent Rodriguez. But that inference is not supported by the evidence, because the evidence shows that when Agent Drake first made that radio call to Agent Rodriguez, Agent Rodriguez had to drive his vehicle to the Higgins Pond point. He wasn't already in an area where these aliens were going to inevitably come to him. So from that, you can infer that there was not going to be any inevitable discovery. And, again, if it's that important for Agent Drake then to notify Agent Rodriguez at that point, it supports the inference that he didn't have them under observation from the time of the border. Because maybe one could say, had it been an inevitable route, it makes sense then for Agent Drake not to say anything for a mile, because he figures, well, these aliens are going to eventually run up on my fellow agent. But they're not. Agent Rodriguez actually had to drive to the area. All right. Let's assume you're correct on that. And those are reasonable inferences. And so we'll assume you should win on the Rule 29 issue. But what about inferences the other way that would support the giving of an instruction so you could make arguments, you know, to draw contrary inferences in the same evidence? Well, Your Honor, we would suggest that not only are our inferences reasonable, but the ones that the defense is asking are speculative. And speculation isn't evidence. And it's not evidence upon which you can found an instruction. And the reason we say that is for a number of reasons. What did it mean when Drake – not Drake, but who was the agent that testified? Rodriguez. Rodriguez testified. Okay. He says, and to your – let's see. Okay. And to your knowledge, was the defendant under constant surveillance by the other agent on March 6, 2003? Yes, I believe so. So what does that mean? I believe from the record – What can you draw on inferences can you draw from that? Well, simply that from the point of the radio contact to the arrest, he was under constant surveillance. And the other interesting thing is – And then he says it's – and then he says – and you said it was a scope operator. Yes, sir. It's actually a telescope that's mounted on the back of a pickup, and it picks up body heat, which is connected to television monitor. You could want to infer from that that he's driving along. You know, he's driving along and he's operating a scope operator. And he sees these guys and he just drives along. Isn't the reasonable – in line with that, isn't the reasonable overall inferences is that the scopes – the purpose of the scope observation is they're trained on the border? They are. Right. So you want to see what somebody crosses the border. So that's – the natural inferences is that's where, you know, where the observation begins, at the border. But just because you can draw that inference doesn't necessarily mean that – No, it doesn't necessarily mean it, but it's a reasonable inference. That's my point. That's all you need to support an instruction. But I don't think that's all the evidence in this case, Your Honor. If you look at the other evidence I discussed earlier, I mean, the fact that the radio call doesn't come to a point when they're already a mile north. And then another interesting point from the evidence, Agent Rodriguez testified that he had radio contact with the scope operator up to the point of arrest. It was constant after the 3 a.m. call. Now, maybe if this scope operator – if the record showed that the scope operator would check in with Agent Rodriguez every five minutes, then maybe one could infer, well, so he watches them for a mile and he doesn't say anything. Then he radios. That's consistent with that practice. If he doesn't make any radio communication until the point where they're already a mile north of the border, and then it's constant from that point to the point of arrest, I think that supports the reasonableness of the government's position here. Now, we don't know what the record shows, but do these scopes – and I – you know, maybe I shouldn't even ask this question, but do the scope operators monitor the area past the border, or are they – as Judge Tashima said, is it their whole purpose to monitor the border? Well, here we do know that he was monitoring from a point north, a mile north, because he basically did guide Agent Rodriguez into the point of arrest after he was a mile north. And that would seem to indicate that he is sort of following them from that point forward. And if that is a mile north of the border – He must be able to see the border area. He must. It could very well be. You know, again, it's unfortunate whenever the record doesn't have – it's not a perfect record, but on a sufficiency, it generally isn't, Your Honor. And from my experience – Well, I mean, I think Judge Tashima, you know, hit it on the nail on the head. You may get over the Rule 29, but the real question is whether or not he should have gotten his jury instruction. I understand that, Your Honor. But, I mean, I – Do you agree that our review is de novo on that question? I do. Okay. De novo generally. And then, you know, there are other cases that kind of guide the analysis, and as long as – you know, I know the district court has given wide discretion in tailoring the instructions. And in this case, I believe, based on the record as a whole, the instruction wasn't warranted, unless there are any further questions I would submit. The device that picks up body heat, what's the range? Unfortunately, it's not in the record, Your Honor. But we do – I mean, I suppose we do know at least that – well, actually, we don't. I was going to say it was a mile away, but we don't even know where the scope operator was. All right. Thank you. Thank you. To answer the last question, at least the scope operator in Rodinas had an operational length of about three miles. But I wanted to focus on that there is direct evidence that the night scope operator was watching these individuals trekking north. Excerpt of record 87. Agent Bruce Drake, actually, which was manning the scope, put it on an alert on the radio that he had a group of seven individuals heading north right around this area. The next page, 88. I went to the area where he saw – where he said he saw a group heading north. Excerpt of record 107. He said he had a group of seven individuals trekking north right around the ponds area. And what happened, you can see from the testimony, is Agent Drake, the night scope operator, positioned the three other agents above the group. And when they actually got out of their vehicles, then they come down on the group to find them hiding. So this isn't just they're hiding in the bush and Drake directs the agents into them. He's watching a group of people trekking north and positions the agents above them. And if they – we're talking about reasonable inferences. But if there are two equally reasonable inferences from this record, a defendant is still entitled to a Rule 29 judgment of acquittal. You do have to look at the facts most favorably to the government. But the inferences you draw from them, if there's two equally inferences, he's entitled to a judgment of acquittal. Thank you. Thank you very much. The matter is being submitted. And next item, U.S. v. Huerta Pimentel. That's deferred. Submission is deferred. Now we come to…
judges: Pregerson, Tashima, Paez